IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| VERONICA JENNINGS, | ) | Case No. 1:19-cv-0840 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff Veronica Jennings seeks judicial review of the final decision of the Commissioner of Social Security denying her application for Supplemental Security Income benefits ("SSI") under Title XVI of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).  Because the ALJ failed to apply proper legal standards in evaluating whether Jennings's mental impairments met or medically equaled Listings 12.03, 12.04, 12.06, 12.08 and 12.15, I recommend that the Commissioner's final decision denying Jennings's application for SSI be VACATED and that her case be REMANDED for further consideration consistent with this report and recommendation.

## II.      Procedural History

On April 14, 2016, Jennings protectively applied for SSI.  (Tr. 224, 319).[1]  She alleged that she became disabled on December 17, 2010 due to "bipolar", schizophrenia, manic

---

[1] The administrative transcript is in ECF Doc. 9.

depression, attention deficit disorder ("ADD"), diabetes and arthritis.  (Tr. 319, 341).  The Social

Security Administration denied Jennings's application initially and upon reconsideration.  (Tr.

247-253, 257-261).  Jennings requested an administrative hearing.  (Tr. 263).  ALJ Joseph Hajjar

heard Jennings's case on April 18, 2018 (Tr. 156-183) and denied the claim in an August 15,

2018, decision.  (Tr. 13-36).  On February 19, 2019, the Appeals Council denied further review,

rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-3).  On April 16,

2019, Jennings filed a complaint seeking judicial review of the Commissioner's decision.  ECF

Doc. 1.

### III.    Evidence

####     A.    Relevant Medical Evidence

#####         1.    Mental Limitations – Evidence Submitted to ALJ

In 2013, Jennings was hospitalized due to suicidal ideation and hearing voices.  (Tr. 887-

893).  On February 15, 2014, Jennings attempted suicide and received inpatient medical care for

five days.  She was diagnosed with schizophrenia, paranoid type, and discharged on February 19,

2014.  (Tr. 849).

On May 27, 2014, Jennings was admitted for inpatient medical care due to hearing voices

and suicidal ideation including trying to cut herself.  (Tr. 822).  She was diagnosed with

lumbago, myofascial muscle pain, bipolar disorder and schizophrenia.  She was discharged on

May 30, 2014.  (Tr. 838).  Jennings received inpatient medical care for suicidal and homicidal

ideation from August 16, 2013 through August 22, 2014.  She reported hearing voices telling her

to cut herself.  (Tr. 402).  She was diagnosed with schizophrenia and schizoaffective disorder.

(Tr. 405).

On September 25, 2014, Jennings received inpatient medical care due to hearing voices. Her fiancé reported taking a knife from her hands.  (Tr. 737).  She was diagnosed with post-traumatic stress disorder and schizophrenia.  (Tr. 762).  She was admitted again from November 10, 2014 through November 13, 2014 due to suicidal ideation and auditory hallucinations.  Her diagnosis of schizophrenia was confirmed.  (Tr. 421, 424).

She was admitted from March 15, 2015 through March 18, 2015, due to attempting to cut her wrists and depression.  (Tr. 495-496).  Her speech was rapid and she was actively hallucinating.  She was diagnosed with schizophrenia, bipolar disorder, anxiety disorder and post-traumatic stress disorder.  (Tr. 498, 500).  From May 22, 2015 through May 26, 2015, Jennings received inpatient care for suicidal ideation and for cutting her wrists.  (Tr. 519).

On June 29, 2015, Jennings was examined in the mobile stroke treatment unit for complaints of slurred speech and right sided numbness.  She was diagnosed with a possible acute ischemic stroke and was sent to University Hospital.  (Tr. 649, 651).

On July 14, 2015, Jennings told Caitlin Vogler, CPST, at Recovery Resources, she had been feeling depressed and was living with her mother temporarily.  (Tr. 1138).  On July 28, 2015, Jennings told Lisa Barto, LPC, that she was still having thoughts about hurting herself.  (Tr. 1141).  She was admitted again to the hospital after attempting to cut her wrists and overdosing on medications.  (Tr. 585).  Her affect was flat and blunted; she was hesitant to speak and appeared to be internally preoccupied.  (Tr. 629).  She was diagnosed with major depressive disorder with psychotic features and was discharged on July 31, 2015.  (Tr. 642).

On August 3, 2015, Jennings returned to Recovery Resources and told Ms. Barto that she was planning to go to Mississippi and confront her father.  She was discouraged from doing so because her mental health was not stable.  (Tr. 1147).  Jennings was unable to go to her

September 8, 2015 appointment with Ms. Vogler due to lack of money and transportation.  (Tr. 1151).

On September 10, 2015, Dr. Anmol Tolani examined Jennings at Recovery Resources. (Tr. 1208).  Dr. Tolani noted a history of major depressive disorder with psychotic features, PTSD, alcohol use disorder and cocaine use disorder.  (Tr. 1209).  Jennings reported an improvement in her symptoms since her medications were optimized during her last inpatient admission.  She was advised to continue her medications with her dosage of Klonopin decreased. (Tr. 1212).

On February 11, 2016, Jennings reported worsening symptoms of anxiety, depression and psychosis auditory hallucinations to Dr. Tolani.  (Tr. 1219).  Dr. Tolani's mental examination returned normal results.  He found that Jennings had logical thought process, fair insight and judgment, euthymic mood, stable affect, normal attention/concentration, well-groomed appearance, cooperative demeanor and intact memory without perceptual disturbance.  Dr. Tolani diagnosed major depressive disorder with psychotic features, PTSD, with alcohol and cannabis disorder in remission.  (Tr. 1223).

On April 28, 2016, Jennings was admitted again for complaints of worsening depression, auditory hallucinations of a voice "Bill" telling her to hurt herself and suicidal thoughts.  (Tr. 586, 619).  She reported that she had run out of medication two to three weeks earlier, which had caused a relapse of her schizophrenic symptoms.  (Tr. 586).  A drug screen was positive for opiates.  (Tr. 589).  Jennings was treated for schizophrenia on an inpatient basis until May 2, 2016.

On June 2, 2016, Jennings returned to Dr. Tolani and reported difficulty keeping her appointments due to transportation problems.  She reported ongoing problems with anxiety,

irritability, restlessness and command auditory hallucinations 5-6 times per month.  (Tr. 1234).
Dr. Tolani noted broad affect and depressed mood.  (Tr. 1236).  He continued Jennings's
prescription for Trazadone and increased her prescription for Lexapro.  (Tr. 1238).

On July 21, 2016, Jennings reported some improvement with an increase in Lexapro.  Dr.
Tolani noted poor/impaired fund of knowledge, euthymic mood and increased Jennings's
prescription for Trazadone and continued her other medications.  (Tr. 1241, 1243).

Jennings saw Dr. Tolani again on October 21, 2016 and reported increased depression,
which she attributed to poor sleep and increased pain.  She also reported anhedonia, anxiety,
feelings of helplessness/hopelessness, and suicidal ideations.  (Tr. 1283).  Dr. Tolani observed a
sad mood and anxious appearance.  (Tr. 1285).  He again increased Jennings's Trazadone
prescription.  (Tr. 1287).

Jennings saw Dr. Tolani on January 26, 2017 and complained of an exacerbation of her
psychosis and depression brought on by a failed reconciliation attempt with her daughter.
Jennings reported anhedonia, feelings of helplessness/hopelessness, racing thoughts, auditory
hallucinations, anxiety and passive suicidal ideation.  (Tr. 1324).  Dr. Tolani recommended
weekly therapy sessions.  (Tr. 1327).  In March 2017, Jennings told Dr. Tolani that her psychosis
and depression were worsening.  (Tr. 1329).  Dr. Tolani prescribed Vistaril 25mg and increased
Jennings's prescription of Perphenazine.  Jennings continued to report persistent symptoms of
psychosis and depression in May 2017.  She complained of anhedonia, auditory hallucinations,
2-3 hours of sleep per night and feelings of hopelessness and worthlessness.  (Tr. 1533).
Jennings prescription for Perphenazine was increased.  (Tr. 1536).  On June 8, 2017, Jennings
reported an improvement of her symptoms to Dr. Tolani and her medications were continued.
(Tr. 1537).

From June 19, 2017 through June 26, 2017, Jennings was admitted for suicidal ideation, command hallucinations, nightmares, pressured speech and racing thoughts. (Tr. 1336-133). Assessment notes state that Jennings was "not forth coming with the details of her current presentation and seems to be focused on her medications. She had a "significant history for multiple admissions with identical presentation of SI after cutting behaviors related to past sexual trauma." (Tr. 1345). She was having auditory hallucinations of her mother's boyfriend, Bill, who raped her at age six. While admitted, Jennings underwent a physical therapy evaluation due to lower extremity arthritis and decreased tolerance to activity. (Tr. 1348). Jennings had a shuffling gait with decreased cadence and increased lateral sway. During her hospitalization, Jennings was prescribed Paxil and Seroquel and responded well. (Tr. 1353). At discharge, Jennings was diagnosed with post-traumatic stress disorder, major depressive disorder, recurrent, severe without psychotic symptoms, a history of polysubstance abuse, and rule out cluster B personality traits. (Tr. 1352).

On July 15, 2017, Jennings went to the emergency room with depression and hearing voices telling her to hurt herself. (Tr. 1442-1443). She was diagnosed with depression with suicidal ideation, but after treatment felt safe to return home. (Tr. 1446-1447). But on July 17, 2017, she returned to the emergency room for suicidal ideation stating that command hallucinations told her to cut her left wrist with a paring knife. (Tr. 1478). Examination revealed a flat affect and a superficial abrasion to the left anterior wrist. (Tr. 1481). Jennings was admitted and treated inpatient at the Cleveland Clinic – Lutheran Hospital until July 19, 2017. (Tr. 1504-1520). She was diagnosed with a mood disorder, bipolar I disorder, most recent episode depressed, severe with psychotic features, and post-traumatic stress disorder. (Tr. 1518).

At a follow-up appointment with Recovery Resources on July 27, 2017, Jennings reported that her overall moods were fair but fluctuated.  She reported that she continued to have auditory hallucinations, but they had improved.  She expressed hope that she could go back to school, and get her GED.  (Tr. 1543).  Mental status examination was unremarkable and included findings that Jennings was well-groomed, had normal attention/concentration, intact memory, euthymic mood, fair insight/judgment, logical thought process and appropriate thought content. (Tr. 1544-1545).

Jennings was examined by Dr. Rob Sledler at Recovery Resources on August 21, 2017. He noted that her records showed mild to moderate depressive symptoms with auditory hallucinations of fluctuating intensity.  He increased her Seroquel prescription and continued her other medications.  (Tr. 1546).  Jennings returned to see Dr. Sledler on September 11, 2017 reporting an improvement in her symptoms and that her auditory hallucinations were less intense and frequent.  She was diagnosed with schizoaffective disorder vs. major depressive disorder with psychotic features and PTSD.  Her medications were continued.  (Tr. 1552).  On November 20, 2017, Jennings reported doing well on her medications with occasional vague visual hallucinations.  She stated that she was "finally feeling the way she has hoped to."  Her medications were continued.  (Tr. 1555).

From April 9, 2018 through April 13, 2018, Jennings was treated on an inpatient basis due to worsening depression and suicidal thoughts with a plan to cut herself.  (Tr. 1570, 1574). Jennings reported being sexually assaulted a month prior with a gun being held against her head. She was diagnosed with major depressive disorder and PTSD.  Jennings's medications were adjusted, she was stabilized and discharged.  (Tr. 1587).

### 2.    Mental Limitations – New Evidence

After the hearing, Jennings submitted additional evidence to the Appeals Council in support of her appeal to the unfavorable decision issued by ALJ Hajjar.  Jennings was admitted and treated from June 28, 2018 through July 2, 2018 for depression, suicidal ideation, racing thoughts and anxiety attacks.  (Tr. 121, 126).  She was diagnosed with major depressive disorder and anxiety.  (Tr. 121).  She was admitted and treated again from August 13, 2019 through August 22, 2018 for depression, suicidal ideation, fear of a spirit named James that lived in her home, and auditory hallucinations of a male voice named Bill.  (Tr. 93).  Jennings appeared disheveled, tearful and anxious.  (Tr. 95).  Jennings was using a wheeled walker to ambulate. (Tr. 102, 109).  Physical examination showed broad and antalgic gait.  (Tr. 111).  At discharge, Jennings was discharged to a skilled nursing facility.  (Tr. 114).

Jennings was at Braeview Care and Rehabilitation from August 22, 2018 through September 12, 2018.  (Tr. 143-155).  While at the nursing facility, Jennings reported that a man knocked on her window resulting in the police being called.  (Tr. 149).  Jennings left the nursing facility on September 12, 2018 "against the advice of the attending physician and the facility administration."  (Tr. 143).

On January 9, 2019, Jennings returned to the emergency room and was admitted with suicidal ideation and command hallucinations from a voice named Bill.  (Tr. 87-92).

### 3.    Physical Limitations

On November 11, 2016, Jennings was examined at St. Vincent Charity Medical Center for left shoulder pain.  (Tr. 1298).  During this appointment, Jennings reported not taking her medications for three weeks.  (Tr. 1293).  Her examination findings were normal with the

exception of 1+ pitting edema in her legs.  (Tr. 1294).  An x-ray of her left shoulder was ordered. (Tr. 1300).

In November 2017, Jennings began receiving home health medical services from nurse practitioner, Michelle Williams-Andrews.  (Tr. 1627).  Ms. Williams-Andrews observed bilateral 1+ pitting edema of the ankles, an enlarged thyroid, fatigue, depression and an anxious mood. (Tr. 1627-1629)  Jennings had a normal gait and denied having any falls in the past year.  (Tr. 1630).  In her functional assessment of Jennings, Ms. Williams-Andrews noted no difficulty or only mild difficulty with dressing, eating, grooming, toileting, transferring, making a phone call, managing finances, and taking medications.  Jennings reported moderate difficulty with preparing meals and extreme difficulty with transportation and shopping.  (Tr. 1630-1631).  Ms. Williams-Andrews diagnosed schizophrenia, unspecified, type 2 diabetes mellitus, vitamin D deficiency and primary osteoarthritis, non-toxic goiter, hypertensive heart disease and anemia. (Tr. 1632).  Ms. Williams-Andrews examined Jennings in her home again on December 20, 2017.  Her observations and diagnoses were similar to her examination in November.  (Tr. 1623, 1624).

On January 17, 2018, Ms. Williams-Andrews made similar observations during her home visit with Jennings.  Ms. Williams-Andrews prescribed a walker with wheels after this visit.  (Tr. 1616-1617).  An echocardiogram on January 17, 2018 showed mild concentric left ventricular hypertrophy with trileaflet aortic valve and mild mitral valve thickening without stenosis.  (Tr. 1636-1637).

On February 21, 2018, Ms. Williams-Andrews examined Jennings and again found 1+ edema of the ankles, tender joint lines on palpation of the bilateral knees, agitation, mild mania, fatigue, depression and an anxious mood.  (Tr. 1609-1610).  She confirmed her diagnoses of

schizophrenia, unspecified, type 2 diabetes mellitus, vitamin D deficiency and primary osteoarthritis. (Tr. 1609). Ms. Williams-Andrews noted that Jennings had received a rollator. (Tr. 1610).

On April 18, 2018, Ms. Williams-Andrews examined Jennings at home again. Jennings reported having trouble bathing, preparing meals and shopping. (Tr. 1598). She complained of joint pain in her knees and back. (Tr. 1600). Physical and mental examination showed bilateral 1+ pitting edema of the ankles, tender joint lines on palpation of the bilateral knees, agitation, mild mania, fatigue, depression and anxious mood. (Tr. 1600-1601). Ms. Williams-Andrews confirmed her prior diagnoses and prescribed a shower bench. (Tr. 1601).

### B. Relevant Opinion Evidence

#### 1. State Agency Consultants

On August 25, 2016, state agency reviewing psychologist, Joseph Edwards, Ph.D., reviewed Jennings's records and concluded that her impairments did not meet or medically equal the criteria of any listed mental impairment. He found that she was only moderately limited in her ability to perform activities of daily living, maintain social functioning, and maintain concentration, persistence or pace. (Tr. 217). Dr. Edwards adopted a prior ALJ's mental RFC, which included limitations to simple, routine tasks with simple, short instructions; making simple decisions; tolerating few workplace changes with no fast-pace production requirements; not being responsible for the safety and well-being of others; and tolerating superficial interaction with coworkers, supervisors, and the public. (Tr. 194, 221).

On January 17, 2017, state agency reviewing psychologist, Bruce Goldsmith, Ph.D., reviewed Jennings's records and agreed that her impairments did not meet or medically equal a listed mental impairment and that she was only moderately limited in her ability to perform

10

activities of daily living, maintain social functioning and maintain concentration, persistence or pace.  (Tr. 236).  Dr. Goldsmith opined that Jennings could: understand, remember, and carry out 1-3 step simple routine tasks; maintain sufficient concentration, persistence, or pace to perform tasks that were not in a fast-pace production quota environment and did not involve the safety and well-being of others; tolerate superficial interaction with supervisors, coworkers and the public; and adapt to environments with infrequent change.  (Tr. 243).

Leanne M. Bertani, M.D., reviewed Jennings's records on August 26, 2016 and opined that she could: lift 20 pounds occasionally and 10 pounds frequently; stand/walk and sit each for about six hours in an eight-hour workday; frequently stoop, kneel and crouch; occasionally crawl and climb ramps and stairs, but could never climb ladders, ropes or scaffolds; and could work in environments that did not involve concentrated exposure to unprotected heights.  (Tr. 219-221).

On January 23, 2017, Abraham Mikalov, M.D., reviewed Jennings's records and generally agreed with the opinions of Dr. Bertani.  However, he further limited Jennings to frequent balancing and overhead reaching and restricted her from commercial driving and being near dangerous moving machinery.  (Tr. 238-241).

## 2.    Examining Physicians

On November 11, 2016, Dr. Efewongbe Olajhe completed a medical source statement after examining Jennings at St. Vincent Charity Medical Center.  (Tr. 1302-1303).  Dr. Olajhe opined that Jennings could rarely crouch, occasionally kneel and frequently climb, balance, stoop, crawl, perform fine and gross manipulation, reach and push and pull.  (Tr. 1302-1303).  She opined that Jennings's impairments did not affect her ability to lift, carry, stand, walk or sit. (Tr. 1302).  Dr. Olajhe also checked boxes indicating that Jennings had not been prescribed a

11

cane, walker or other equipment and that she experienced only mild pain that did not interfere with her concentration, take her off task or cause absenteeism.  (Tr. 1303).

On January 19, 2017, Dr. Eulogio Sioson completed a consultative exam of Jennings's physical impairments at the request of the Social Security Administration.  (Tr. 1311).  Dr. Sioson observed marked lower back tenderness, tingling and numbness of stocking distribution and weakness of grasp and pinch in both hands.  (Tr. 1312-1313).  He observed spinal tenderness, but noted that Jennings walked normally with no assistive device, and that she could heel/toe walk.  (Tr. 1311).  Dr. Sioson's impression was diabetes mellitus, moderate to markedly impaired uncorrected vision and probably with peripheral neuropathy/arthritis, and mental disorder.  He opined that there were no objective findings that would significantly affect walking, standing, sitting, lifting, carrying or handling.  However, if her reported pain was considered, he opined that her work related activities would be limited to the sedentary exertion level.  (Tr. 1312).

### C.    Relevant Testimonial Evidence

Jennings testified at the ALJ hearing.  (Tr. 165-179).  She was 5'1" tall and weighed 210 pounds.   She lived with her fiancé.  (Tr. 165).  She did not have a driver's license and was unable to drive.  She dropped out of school after eighth grade and had not obtained a GED.  (Tr. 166).  She had not worked for a very long time.  Her last job was deboning catfish.  (Tr. 167).

Jennings testified that the main reasons she was unable to work was her concentration and her health.  (Tr. 172).  She heard voices and had racing thoughts.  (Tr. 176-177).  Her sleep was poor but had improved since her medications were changed at the hospital the last time.  (Tr. 175).

Jennings did not do much besides watch TV.  She was able to go shopping.  (Tr. 168-169).  Her fiancé would walk with her, but she couldn't walk far.  She did not do any household chores; an aide came to her house to help her bathe.  (Tr. 168).  She had been using a walker for about four or five months.  (Tr. 170).

Jennings did not belong to any groups and had only one friend.  (Tr. 169-170).  She no longer had any hobbies.  (Tr. 169, 173).  She had previously enjoyed cooking, but was no longer interested in it.  (Tr. 174).

Vocational Expert ("VE") Deborah Lee also testified at the hearing.  (Tr. 179-182).  The ALJ asked the VE to consider a hypothetical individual with no past work experience who was limited to light exertional work.  The person could only occasionally climb ramps and stairs but never ladders, ropes or scaffolds.  She could frequently balance and occasionally stoop, kneel, crouch and crawl.  She could not work near unprotected heights or moving mechanical parts and could not engage in commercial driving.  She was limited to simple, routine tasks with simple, short instructions with no strict production rate pace requirements.  She was limited to simple work-related decisions and could tolerate only occasional and superficial interactions with supervisors, co-workers and the public.  She could not take responsibility for the safety and well-being of others and could not negotiate or confront.  She could tolerate occasional workplace changes.

The VE testified that this hypothetical individual could perform jobs such as a laundry folder, inspector/hand packager, and cafeteria attendant.  (Tr. 180-181).  She opined that employers would tolerate up to 20% of off-task time and one absence for illness per month.  (Tr. 181).

## IV.     The ALJ's Decision

The ALJ made the following findings relevant to this appeal:

2.  Jennings had the severe impairments of schizophrenia, bipolar disorder,
    depressive disorder, anxiety disorder, post-traumatic stress disorder, borderline
    personality disorder, polysubstance abuse in remission, obesity, degenerative
    spine disorder, right hip degenerative joint disease, and diabetes.  (Tr. 19).

3.  Jennings did not have an impairment or combination of impairments that met
    or medically equaled the severity of one of the listed impairments.  (Tr. 21).

4.  Jennings could perform light work except she could sit for six hours and stand
    and/or walk for six hours in an eight-hour workday.  She could push/pull as
    much as she could lift and carry.  She could occasionally climb ramps and
    stairs but could never climb ladders, ropes or scaffolds.  She could frequently
    balance and could occasionally stoop, kneel, crouch and crawl.  She could
    never work at unprotected heights or near moving mechanical parts.  She could
    never drive a commercial vehicle. She could understand, remember and carry
    out simple, routine tasks with simple, short instructions and no strict
    production rate pace requirements.  She could use judgment to make simple
    work-related decisions.  She could have occasional and superficial interactions
    with supervisors, co-workers and the public that did not involve being
    responsible for the safety and wellbeing of others, negotiations, or
    confrontations.  She could adapt to occasional workplace changes.  (Tr. 25-26).

9.  Considering her age, education, work experience, and residual functional
    capacity, there were jobs existing in significant numbers in the national
    economy that Jennings could perform. (Tr. 35).

Based on all his findings, the ALJ determined that Jennings had not been under a disability since

April 14, 2016, the date her application was filed. (Tr. 36).

## V.     Law & Analysis

### A.     Standard of Review

The court reviews the Commissioner's final decision to determine whether it was

supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C.

§§ 405(g), 1383(c)(3); *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003).

Substantial evidence is any relevant evidence, greater than a scintilla, that a reasonable person

would accept as adequate to support a conclusion.  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  If supported by substantial evidence and reasonably drawn from the record, the Commissioner's factual findings are conclusive – even if this court might reach a different conclusion or if the evidence could have supported a different conclusion.  42 U.S.C. §§ 405(g), 1383(c)(3); *see also Elam*, 348 F.3d at 125 ("The decision must be affirmed if . . . supported by substantial evidence, even if that evidence could support a contrary decision."); *Rogers*, 486 F.3d at 241 ("[I]t is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record.").  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if supported by substantial evidence, however, the court will not uphold the Commissioner's decision when the Commissioner failed to apply proper legal standards, unless the error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right.");  *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error.").  Furthermore, the court will not uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v.*

*Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy.  20 C.F.R. § 416.920(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006).  Although it is the Commissioner's obligation to produce evidence at Step Five, the claimant bears the ultimate burden to produce sufficient evidence to prove that she is disabled and, thus, entitled to benefits.  20 C.F.R. §§ 404.1512(a), 416.912(a).

### B.    Mental Impairment Listings

Jennings argues that the ALJ erred in finding that her mental impairments did not meet or medically equal Listings 12.03, 12.04, 12.06, 12.08 or 12.15.  At Step Three, the claimant has the burden of proving that she has an impairment or combination of impairments that meet or medically equal a listed impairment.  *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); 20

16

C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  The claimant is conclusively presumed disabled if she meets or medically equals a listed impairment; otherwise, the evaluation proceeds to the fourth step.  20 C.F.R. § 404.1520(d)-(e), 416.920(d)-(e); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *see also Rabbers v. Comm'r of SSA*, 582 F.3d 647, 653 (6th Cir. 2009) ("A claimant must satisfy all of the criteria to meet the listing.").  "If . . . the record raises a substantial question as to whether the claimant could qualify as disabled under a listing, the ALJ should discuss that listing."  *Sheeks v. Comm'r of SSA*, 544 F. App'x 639, 641 (6th Cir. 2013) (quotation and alterations omitted); *see also Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 415–16 (6th Cir. 2011) (holding that the ALJ erred by not conducting any Step Three evaluation of the claimant's physical impairments, when the ALJ found that the claimant had the severe impairment of back pain).  Nonetheless, "the ALJ need not discuss listings that the applicant clearly does not meet, especially when the claimant does not raise the listing before the ALJ."  *Sheeks*, 544 F. App'x at 641; *see also Hutchinson v. Bowen*, 787 F.2d 1461, 1463 (11th Cir. 1986) (stating that, when an ALJ "did not explicitly state that the appellant's impairments were not contained in the listings, such a determination was implicit in the ALJ's decision" because he proceeded to Step Four).  When an ALJ fails to explain adequately why the claimant's impairments did not meet or medically equal a listed impairment, that error is harmless if the claimant does not produce sufficient evidence to show that his impairments met or medically equaled a listed impairment.  *See Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014).

The mental impairment listings are met by medical criteria in the record evidence showing that the claimant has been diagnosed with a mental impairment ("Paragraph A") and that it affects his or her functioning ("Paragraph B.").  If the medical criteria of Paragraph A are

17

satisfied, the agency considers whether the record evidence shows that a claimant's mental impairments affect her ability to function in the workforce.  "Paragraph B" of the mental impairment listings provides the functional criteria used to evaluate a claimant's mental impairments.

> These criteria represent the areas of mental functioning a person uses in a work setting.  They are: understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself.  The agency determines the degree to which the claimant's medically determinable mental impairment affects the four areas of mental functioning and the claimant's ability to function independently, appropriately, effectively, and on a sustained basis.  To satisfy the paragraph B criteria, the claimant's mental disorder must result in "extreme" limitation of one, or "marked" limitation of two, of the four areas of mental functioning.

See 20 C.F.R. § 404.1520a(c)(2) and 20 C.F.R. § 416.920a(c)(2).  To establish a "marked" limitation in any of these areas, the claimant's impairment must "seriously interfere with the ability to function independently, appropriately, and effectively."  *See Foster v. Bowen*, 853 F.2d 483, 491 (6th Cir. 1988); *Harvard v. Comm'r of Soc. Sec.*, 2014 U.S. Dist. LEXIS 181746, 2015 WL 506976 at * 14 (N.D. Ohio Feb. 6, 2015).

The ALJ's finding that Jennings's mental impairments did not meet or medically equal the mental impairment listings was based on his evaluation of the "paragraph B" criteria.  The ALJ found that Jennings did not have any marked or severe functional limitations.  Jennings argues that the record evidences marked limitations in her ability to concentrate, persist, or maintain pace, and in her ability to adapt or manage herself.

> Regarding concentration, persistence, or pace, the regulations provide as follows:

> This area of mental functioning refers to the abilities to focus attention on work activities and stay on task at a sustained rate.  Examples include: Initiating and performing a task that you understand and know how to do; working at an appropriate and consistent pace; completing tasks in a timely manner; ignoring or avoiding distractions while working; changing activities or work settings without being disruptive; working close to or with others without interrupting or

distracting them; sustaining an ordinary routine and regular attendance at work; and working a full day without needing more than the allotted number or length of rest periods during the day.  These examples illustrate the nature of this area of mental functioning.  We do not require documentation of all of the examples.

20 CFR Part 404, Subpt. P, Appx 1, § 12.00(E)(3).

Regarding Jennings's ability to concentrate, persist or maintain pace, the ALJ stated:

The third functional area is concentrate, persist or maintain pace.  With regard to concentrating, persisting, or maintaining pace, the claimant has a moderate limitation.  This refers to an individual's ability to focus attention on work activities and stay on task at a sustained rate.  Examples include the ability to initiate and perform tasks, work at a consistent pace, complete tasks in a timely manner, ignoring or avoiding distractions while working, changing activities without being disruptive, and sustaining a routine and regular attendance.  The undersigned notes that the claimant remained focused and engaged throughout the pendency of the hearing in this matter.  (Hearing Testimony).  She testified cohesively, demonstrating her ability to remain focused on the matter at hand, understand the questions posed to her, organize her thoughts appropriately, and formulate concise responses while maintaining the decorum appropriate for the setting of a hearing before an Administrative Law Judge.  (Hearing Testimony).  The claimant reported racing thoughts and decreased concentration.  However, notwithstanding her subjective complaints, on consultative examination, the claimant had intact concentration.  (Exhibit B15/F2).  Likewise, she often had normal attention and concentration on mental status examination.  (*See e.g.,* Exhibits B16F/9; B22F/3, 13, 19).  Additionally, at times, the claimant has been able to cook, do crossword puzzles, read the Bible, watch TV, make crafts, use public transportation, babysit minor children, and manage finances.  (Exhibits B3F/44; B6F/73, 74, 98, 125, 217, 263, 266; Hearing Testimony).  These activities of daily living evidence the claimant's ability to sustain concentration, persistence, or pace appropriate to those tasks.  Overall, the longitudinal record supports a finding that the claimant has no more than moderate limitations in this functional area.  As detailed more fully in Finding 4, the undersigned has fully considered and accommodated this limitation in the residual functional capacity by restricting the claimant to work involving the ability to understand, remember and carry out simple, routine tasks with simple, short instructions and no strict production rate pace requirements.  (Tr. 24-25).

Jennings argues that the medical records showed that she had severe problems sleeping, and had anxiety, auditory hallucinations, anhedonia, suicidal ideation, panic attacks and depression.  She cites records showing that she discussed her ongoing fatigue, difficulty concentrating, irritability, racing thoughts, nightmares, restlessness, and suicidal ideation with

19

her treatment providers.  ECF Doc. 11 at 16.  (See, e.g., Tr. 1337, 1346, 1543.)  She also testified

that her main disability is impaired concentration due to her racing thoughts and auditory

hallucinations.  (Tr. 172, 176-177).  She argues that these symptoms, persistently experienced,

seriously limited her ability to concentrate and persist on tasks.

When the evidence could support a finding that the claimant's severe impairment meets a

listing, the ALJ must "evaluate the evidence, compare it to . . . the Listing, and give an explained

conclusion, in order to facilitate meaningful judicial review."  *Reynolds,* 424 F. App'x 411, 416

(6th Cir. 2011); *See also, Hunter v. Astrue,* No. 1:09 cv 2790, 2011 U.S. Dist. LEXIS 148585 at

*10-12 (N.D. Ohio Dec. 20, 2011).  The ALJ attempted to do that here, but there is a disconnect

between the cited evidence and his conclusion regarding Jennings's ability to concentrate, persist

and maintain pace.  His own evaluation of Jennings's ability to concentrate, persist and maintain

pace during the hearing is of little value in determining whether she could concentrate for an

eight-hour workday because the hearing in this case lasted less than 40 minutes.  (Tr. 158, 183).

The ALJ next cited a consultative examination of Jennings's *physical* impairments

wherein the physician stated that Jennings was able to maintain concentration during the

examination.  (Tr. 1312)  But this examining physician was focused on Jennings' physical

limitations.  He did not perform tests designed to evaluate Jennings ability to concentrate.  (Tr.

1311-1312).  He performed manual muscle and range of motion tests and rendered an opinion on

her physical abilities and exertion level.  (Tr. 1313).   Moreover, in reporting her history, the

consulting examiner noted:

> **Mental disorder:**  10-year history of depression, bipolar disorder, ADHD and
> schizophrenia.  She was hospitalized many times with suicidal thoughts and
> attempt – last one 4/2016 – all her medications changed at that time.  She has poor
> sleep and appetite and lost weight.  She feels tired all the time, hopeless
> sometimes.  She has memory and concentration problems and hear voices.  Her
> medications help sometimes.

It does not appear that Dr. Sioson actually evaluated any of the mental functioning categories related to the mental impairment listings.  Thus, the ALJ's reliance on this evidence seems misplaced.  The ALJ also cited a few treatment notes where "normal" boxes were checked on mental examination of Jennings's concentration that do not really create a full picture of Jennings's impairments.  (Tr. 24).

The ALJ then cited notes from some of Jennings's hospitalizations to support his conclusion that Jennings's activities of daily living included activities such as cooking, doing crossword puzzles, reading the Bible, watching TV, making crafts, using public transportation, babysitting minor children and managing finances.  (Tr. 24).  But a review of the cited records paints a very different picture of Jennings's activities of daily living.  For example, the ALJ cited record B3F/44.  This record was created during one of the occasions when Jennings was hospitalized for attempted suicide and suicidal ideation.  She reported that her boyfriend did all household chores, she had not gone to the library in a while, and was not attempting to implement coping skills prior to hospitalization.  She reported her "leisure" as "computer, exercise, music, reading, spending time with friends, television and no participation."  (Tr. 525).  While Jennings listed these activities as her leisure activities, this record does not actually document that she was doing any of these activities on a daily basis.  She reported that she had *not* been attempting to implement coping skills prior to her hospitalization.

Next, the ALJ cited record B6F/73.  This is a record from another of Jennings's hospitalizations.  When she arrived at the hospital, Jennings was banging her head against the wall.  The hospital staff tried to discuss coping skills with Jennings such as reading, writing and watching TV.  Jennings said that she liked to do crossword puzzles.  The staff gave her a crossword puzzle, but Jennings continued to lightly bang her head on the wall.  She ultimately

had to be restrained in a chair so that she would not hurt herself.  (Tr. 663).  This record does not

evidence that Jennings's activities of daily living included crossword puzzles or that she was able

to concentrate or persist at an activity.  To the contrary, when she was given a crossword puzzle,

she continued to bang her head against the wall.  (Tr. 663).

Some of the records cited by the ALJ show that some of the "effective coping strategies

used" were "walking, music, movies and television, plants/gardening, spending time with family,

and working out in her apartment's gym every morning."  However, it is not clear that these

were "coping strategies" or even things that Jennings actually did on a regular basis.  (Tr. 688,

715).  And, the fact that Jennings attended craft groups while hospitalized after a suicide attempt,

does not evidence that she made crafts daily.  (Tr. 807).

Moreover, even if the record showed that Jennings was occasionally able to do these

activities, that does not necessarily prove that she could focus her attention on work activities

and stay on task at a sustained rate.  As already stated, there appears to be a disconnect between

the ALJ's reasoning and the evidence in Jennings's record.

Regarding the mental functioning category of adapting and managing oneself, the

Regulations provide:

> This area of mental functioning refers to the abilities to regulate emotions, control
> behavior, and maintain well-being in a work setting.  Examples include:
> Responding to demands; adapting to changes; managing your psychologically
> based symptoms; distinguishing between acceptable and unacceptable work
> performance; setting realistic goals; making plans for yourself independently of
> others; maintaining personal hygiene and attire appropriate to a work setting; and
> being aware of normal hazards and taking appropriate precautions.

20 CFR Part 404, Subpt. P, Appx 1, § 12.00(E)(4).

Regarding Jennings's ability to adapt and manage herself, the ALJ stated:

> The fourth functional area is the ability to adapt or manage oneself.  As for
> adapting or managing oneself, the claimant has experienced a moderate limitation.

This refers to an individual's ability to respond to demands, adapt to changes, manage psychologically based symptoms, distinguish between acceptable and unacceptable  performance, maintain appropriate hygiene and attire, and maintain awareness of hazards and take appropriate precautions.  The claimant is able to travel interstate and to babysit her grandchildren (B23F/13), which evidences her ability to adapt to changes and demands.  Likewise, the claimant and her fiancé moved to a new apartment (Exhibit B22F/24), which evidence the claimant's ability to adapt to changes.  The claimant was described as well dressed and well groomed.  (*See e.g.,* Exhibits B1F/5, 15; B2F/5, 15; B3F/43; B6F/20, 24, 25, 38, 51, 98, 107, 108, 134, 136; B9F/20; B16F/9, 14; B19F/ 37, 68, 101, 130; B23F/10; *but see* Exhibit B6F/73).  The claimant is also able to cook and use public transportation.  These activities of daily living evidence her ability to maintain awareness of hazards and take appropriate precautions.  Overall, the longitudinal record supports a finding that the claimant has no more than moderate limitations in this functional area.  As detailed more fully in Finding 4, the undersigned has fully considered and accommodated this limitation in the residual functional capacity by restricting the claimant to work involving simple work related decisions and occasional workplace changes.  (Tr. 25).

Jennings argues that she was incapable of managing her symptoms so as to be able to navigate her everyday life.  She cites the facts that she needed an assistant/aide to help with home activities (Tr. 168-169, 173) and that her symptoms caused numerous emergency room visits and extended inpatient hospitalizations.  She argues that the record shows her inability to adapt and manage herself.  ECF Doc. 11 at 15.

The Commissioner argues that the ALJ properly cited support for his decision by noting that Jennings could travel and babysit her grandchildren and had moved to a new apartment.  He also noted that she was described as well-dressed and well-groomed and that she was able to cook and use public transportation.  (Tr. 25).  Again, this appears to be an overstatement of Jennings's abilities as shown by the record evidence.  In fact, the record shows that Jennings had extreme difficulty with transportation.  (Tr. 1631).  She ultimately obtained home health visits and the nurse practitioner noted that she had difficulty "bathing, preparing meals, shopping and transportation."  (Tr. 1627).  The record shows very infrequent travel and babysitting of her grandchildren, very little cooking and very little use of public transportation.   (Tr. 166, 173-174)

23

The ALJ cited treatment notes from April 2018 stating that Jennings was "making plans to travel to Mississippi in order to see her daughter and her grandkids."  (Tr. 1581)  However, the same paragraph of this record states that Jennings "could not handle the bad memories, kept having racing thoughts and developed suicidal thoughts" and had recently been on "an emotional downwards spiral."  (Tr. 1581).  The physician's impression after this visit was "worsening depression in setting of recent life-stressors and trauma."  (Tr 1581).

The ALJ also cited treatment notes from November 2017 stating that Jennings had been unable to visit her daughter and granddaughter because she was moving to a new apartment. This record states that Jennings was excited to move into a new apartment, but it does not contain any information about how she adapted to the change.   There was no evidence showing that she easily adapted to the move.

The ALJ cited numerous records showing that Jennings was well dressed and groomed (Tr.25), but he also noted a record showing that she was "disheveled."  (Tr. 663).  During her hearing, Jennings stated that she was not able to do any household chores and that an aide was coming to her house to help her bathe.  (Tr. 168-169, 1627).

Finally, the ALJ stated that Jennings could cook and use public transportation.  But the record evidence shows that Jennings had trouble preparing meals (Tr. 1627) and that she no longer had any interest in cooking.  When asked why she no longer cooked, Jennings testified that she had "almost had a pot burn up."  (Tr. 173-174).  And, as already stated, she was also noted as having difficulty with transportation.  (Tr. 1627).

Toward the end of his decision, the ALJ noted that during one of Jennings's numerous hospital admissions, malingering and drug seeking behavior were listed as possible diagnoses. (Tr. 29, 1345).  The ALJ did not discount Jennings's claim to suffer from impairments based on

a conclusion that she was malingering; he found that she suffered from several severe impairments. But the ALJ did point out several instances in which he found that her claims of limitations were inconsistent with the objective evidence. Thus, it seems likely that he may have believed Jennings to be a malingerer. Because the Commissioner has not raised the issue of malingering in his brief, it is not necessary for the court to analyze whether the record supported a conclusion that Jennings's claim should be discounted based on this issue.

Neither party cites any opinion from a physician who examined Jennings and specifically evaluated her mental impairments. Such an opinion would have been extremely helpful in this case. The court is mindful that the ALJ is not required to accept Jennings's own statements about her abilities to function in a sustained manner. *See Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994). However, there was evidence in the record that supported Jennings's statements regarding her inability to concentrate. (See, e.g., Tr. 1337, 1346, 1543.) And the records cited by the ALJ did not support his conclusion that Jennings was regularly able to participate in activities of daily living in a manner suggesting that she would also be able to concentrate, adapt and manage herself in a work setting on a sustained basis. By citing evidence that did not actually support his conclusions about Jennings's daily activities or functional abilities, it appears that the ALJ failed to follow SSR 16-3p, 2016 SSR LEXIS 4 *15. Moreover, the ALJ's citation of records from Jennings's inpatient hospitalizations – after she tried to cut her wrists – does not necessarily evidence that she would be able to function the same way in a workplace setting.

Because there was conflicting evidence and because the evidence potentially supported a finding that Jennings's impairment met one of listed mental impairments, the ALJ was required to provide a more accurate and complete discussion of the record evidence. His superficial

conclusion that her activities of daily living included activities such as cooking, doing crossword puzzles, reading the Bible, watching TV, making crafts, using public transportation, babysitting minor children, and managing finances was not supported by the records he cited.  I recommend that the Court vacate the ALJ's decision and remand the case with a requirement that the ALJ more accurately and fully evaluate the record evidence to determine whether Jennings's mental impairments meet the Paragraph B criteria of Listings 12.03, 12.04, 12.06, 12.08 or 12.15.  The ALJ must build a logical bridge between the record and his conclusion.

### C.    Rolling Walker or Cane

The ALJ did not necessarily err when he found that it was not medically necessary for Jennings to use a walker or cane.  "[T]he Sixth Circuit has held that if a cane is not a necessary device for the claimant's use, it cannot be considered a restriction or limitation on the plaintiff's ability to work."  *Murphy v. Astrue*, 2013 U.S. Dist. LEXIS 30492, 2013 WL 829316, at *10 (M.D.Tenn. March 6, 2013), citing *Carreon v. Massanari*, 51 Fed. App'x 571, 575 (6th Cir. 2002); *Cruz-Ridolfi v. Comm'r of Soc. Sec.*, 2018 U.S. Dist. LEXIS 32651, 2018 WL 1136119, at *15 (N.D.Ohio Feb. 12, 2018), report and recommendation adopted, 2018 U.S. Dist. LEXIS 32642, 2018 WL 1083252.  To be considered a restriction or limitation, a cane "must be so necessary that it would trigger an obligation on the part of the Agency to conclude that the cane is medically necessary," i.e., the record must reflect "more than just a subjective desire on the part of the plaintiff as to the use of a cane."  *Murphy*, 2013 U.S. Dist. LEXIS 30492, 2013 WL 829316, at *10 (internal citations omitted).  "If the ALJ does not find that such device would be medically necessary, then the ALJ is not required to pose a hypothetical to the VE."  *Id.* Generally, an ALJ's finding that a cane or other assistive device is not medically necessary is error when: (i) the claimant has been prescribed an assistive device, (ii) the ALJ did not include

the use of the device in the RFC assessment, and (iii) the ALJ did not explain the omission.

*Cruz-Ridolfi v. Comm'r of Soc. Sec.,* 2018 U.S. Dist. LEXIS 32651, 2018 WL 1136119, at * 10

(N.D. Ohio Feb. 12, 2018) (quoting *Watkins v. Comm'r of Soc. Sec.,* 2017 U.S. Dist. LEXIS

212997, 2017 WL 6419350, at *11 (N.D. Ohio Nov. 22, 2017), report and recommendation

adopted, 2017 U.S. Dist. LEXIS 205871, 2017 WL 6389607.

> Regarding Jennings's use of a cane or walker, the ALJ stated:

> Although during a consultative examination on January 19, 2017, the claimant indicated that she had been using a regular cane, Dr. Sioson observed that she walked normally with no assistive device.  (Exhibit B15F/1).  Similarly, when receiving physical therapy during an inpatient psychological hospitalization in June of 2017, one of the claimant's stated treatment goals was to get a cane or a walker.  (Exhibit B17F/14).  In fact, the claimant was independent with "all mobility" on the unit.  (Exhibit B17F/17).  Notes from a visit by Michelle Williams-Andrews, NP dated April 18, 2018, indicate that the claimant complained of arthritis in her knees and a "rollator" was received.  However, the record does not demonstrate the medical necessity of this device, as this was Ms. Williams-Andrew's first visit with the claimant and Ms. Williams-Andrews is not an acceptable medical source.  Furthermore, under the regulations, to find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held device and describing the circumstances for which it is needed (i.e., all the time, periodically, distance, terrain, etc.).  (SSR 96-9p).  Overall, the record does not support a finding that the claimant requires a medically necessary assistive device.  Therefore, the undersigned declines to include any additional limitations in the residual functional capacity.

(Tr. 34-35).  As with his decision on Jennings's mental impairments, there is a disconnect

between the cited evidence and the ALJ's decision that she did not require an assistive device for

walking.

The ALJ did not acknowledge that Ms. Williams-Andrews prescribed a rollator for

Jennings.  (Tr. 1617).  However, he properly noted that Ms. Williams-Andrews was not an

acceptable medical source.  (Tr. 34).  He stated that Ms. Williams-Andrews made note of the

rollator on her first visit with Jennings, but that was incorrect.  Ms. Williams-Andrews met with

Jennings in November 2017.  She prescribed the rollator in January 2018, and noted that it had been received in February 2018.  (Tr. 1627, 1617, 1610).  The ALJ cited several treatment notes in the record showing that Jennings expressed a desire for a walker despite having a normal gait. Jennings cites different records suggesting that she *did* need a walker and argues that the ALJ should have assigned greater weight to the records she cited.

The fact that there was evidence in the record supporting a different conclusion than the ALJ reached does not necessarily mean that the ALJ erred by excluding the walking device from Jennings's RFC.  *Blakley v. Comm'r of Soc. Sec,* 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  The ALJ stated that Ms. Williams-Andrews noted the use of a rollator, and he explained why he did not include the use of a walker in his RFC assessment.  It may not have been error to omit the walking device from the RFC in this case.  *See Carder v. Comm'r of Soc. Sec., Cruz-Ridolfi,* Case No. 1:18-cv-578, 2018 U.S. Dist. LEXIS 32651, at *15-16 (N.D.Ohio March 7, 2019).   However, the ALJ mischaracterized Nurse Williams-Andrews' treatment notes.  And, as noted, the ALJ never mentioned that Williams-Andrews actually prescribed the device.  Even though Williams-Andrews is not an acceptable medical source warranting deference under the Commissioner's regulations, she is a licensed medical provider authorized to prescribe, and the ALJ should have addressed the fact of the prescription.  Because I am recommending remand for the ALJ to build a logical bridge between the evidence and mental impairment listing finding, the ALJ should also provide a more accurate and complete explanation of why he concluded that no walking device should have been included in Jennings's RFC.

### D.    New Evidence

Finally, Jennings argues that new and material evidence supports a finding of disability.

Sentence six of 42 U.S.C. § 405(g) provides:

> The Court may...remand the case to the Commissioner of Social Security for further action by the Commissioner of Social Security, and it may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding...

42 U.S.C. § 405(g).  The Sixth Circuit further defined the requirements that elements be "new,"

"material," and that the plaintiff show "good cause" as follows:

> For the purposes of a 42 U.S.C. § 405(g) remand, evidence is new only if it was 'not in existence or available to the claimant at the time of the administrative proceeding.' ... Such evidence is 'material' only if there is 'a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence.' ... A claimant shows 'good cause' by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ.... [T]he burden of showing that a remand is appropriate is on the claimant.

*Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276 (6th Cir. 2010) (quoting [*9]  *Foster v.*

*Halter*, 279 F.3d 348, 357 (6th Cir. 2001)).

The law permits this Court to remand for only two reasons - either under Sentence Six, or

under Sentence Four of 42 U.S.C. § 405(g).  The two types of remands are mutually exclusive.

*Farlow v. Comm'r of Soc. Sec.,* No. 1:17-cv-27, 2018 U.S. Dist. LEXIS 26415 (Feb. 20, 2018).

Under Sentence Four, a court may enter "a judgment affirming, modifying, or reversing the

decision of the Secretary, with or without remanding the cause for a rehearing."  *Walton v.*

*Astrue,* 773 F. Supp. 2d 742, 746 (N.D. Ohio 2011)(internal citation omitted).  Unlike a remand

under Sentence Six, in a Sentence Sour remand, this Court enters final judgment and does not

retain jurisdiction.

Jennings's Sentence Six argument may have merit.  She did submit new evidence.  And,

although the ALJ's consideration of the evidence of another hospital stay might not have led him

to a different disposition of her disability claim, the evidence of her skilled-rehabilitation

inpatient care might have – both because it showed that she regularly used a walker (Tr. 150) and

because she was discharged "against the advice of the attending physician and the facility

administration."  (Tr. 143).  Thus, it may also be material.  However, if the court accepts my

recommendation to remand this matter pursuant to Sentence Four of 42 U.S.C. § 405(g), it will

be unnecessary to determine whether Jennings is entitled to a remand under Sentence Six.  We

cannot consider the new evidence under Sentence Four.  *See Cline v. Commissioner of Soc. Sec.,*

96 F.3d 146, 148 (6th Cir. 1996).  By contrast, the ALJ may properly consider the new evidence,

as well as any *other* new evidence, upon remand under Sentence Four.  *See Sullivan v.*

*Finkelstein,* 496 U.S. 617, 625-26, 110 S.Ct. 2658, 2664, 110 L. Ed. 2d 563 (1990); *Faucher v.*

*Sec'y of Health and Human Servs.,* 17 F.3d 171, 173-175 (6th Cir. 1994).

## VI.    Recommendations

Because the ALJ failed to apply proper legal standards in evaluating whether Jennings's

mental impairments met or medically equaled Listings 12.03, 12.04, 12.06, 12.08 and 12.15, I

recommend that the Commissioner's final decision denying Jennings's application for SSI be

VACATED and that her case be REMANDED for further consideration consistent with this

report.  I further recommend that should the foregoing recommendation be adopted, the Court's

remand order should direct the ALJ to further consider and discuss Jennings's need for an

assistive walking device.  And I recommend that the ALJ be directed to consider the new

evidence Jennings has submitted.

Dated: March 17, 2020

Thomas M. Parker

United States Magistrate Judge

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).